HENRY SLABACK, APPELLANT, VS. LEOMA L. CUSHMAN, APPELLEE.

1. The proclamation of the President of the United States of January 1, 1863, known as the Emancipation Proclamation, was a military order founded upon a supposed military necessity, in a time of war, and became operative only when the Federal Government was enabled by the power of arms to enforce it.

Appeal from the Circuit Court for Santa Rosa county.

Statement of the case by RANDALL, C. J.:

This was an action of assumpsit commenced in 1866, by the appellee, to recover for the services of a negro woman, let to hire by the appellee to the appellant, from October 20, 1863, to March 20, 1865. Plea, non-assumpsit; and further, that the woman for whose services the plaintiff claims was a freedwoman at the time of the hiring, by virtue of the proclamation of the President of the United States and the results and effects of the war then prevailing, and the services rendered were contracted for with the freedwoman, &c.

At the trial the court charged the jury that if the defendant hired the negro woman of the plaintiff in October, 1863, plaintiff is entitled to recover for such time as he had her services, not extending beyond the time named in the bill of particulars, at such sum as may have been agreed upon. And if they believe from the testimony that the defendant was deprived of the services of the woman by the action of the United States military

authorities, then the plaintiff could not be entitled to recover after that time, but no voluntary payment by defendant to the woman would exonerate him.

Defendant asked the court to charge the jury, that at the date of the hiring in this case, the negro woman hired was a freed-woman and not a slave, by virtue of the Emancipation Procla-mation of the President of the United States, which took effect January 1, 1863, and therefore the plaintiff is not entitled to recover any hire in the case, which charge the judge refused to give, on the ground that he was asked to charge upon the facts of the case. To which ruling the defendant excepted.

Verdict for plaintiff, appellee, for $136, and defendant prose-cutes a writ of error, and assigns errors as follows :

1. The court below erred in refusing the instructions asked for by the appellant on the trial.

2. In refusing to take judicial notice of the proclamation of the President of the United States known as the Emancipation Proclamation.

*E. W. Jones*, for Appellant.

In this case, the only question is as to the propriety of the rul-ing of the court below as to the instructions asked for by the defendant's counsel.

The ruling of the court below was based upon the supposition that the proclamation of the President was matter of fact.

The court should have taken judicial notice of the proclama-tion without formal proof. 12 Greenleaf's Ev.; 11 Vesey, 292; 3 M. & S., 67; 2 Sim., 213.

As to the legal effect of the proclamation, I insist that the court should follow the decision of the political department of the government. 4 Cranch, 241; 2 Peters, 367; Williams vs. Suffolk In. Co., 13 Peters; Garcia vs. Lee, 12 Peters.

No counsel for Appellee.

42

RANDALL, C. J., delivered the opinion of the court:

The question presented by the record for our determination is, as to the effect of the "proclamation of emancipation" issued by the President of the United States on the first day of January, A. D. 1863. On that day the President of the United States issued a proclamation reciting that on the 22d day of September, A. D. 1862, he had issued a proclamation announcing "that on the first day of January, 1863, all persons held as slaves within any State or designated parts of a State, the people whereof shall then be in rebellion against the United States, shall be then thenceforward and forever free; and the executive government of the United States, including the military and naval authority thereof, will recognize and maintain the freedom of such persons, and will do no act or acts to repress such persons, or any of them, in any efforts they may make for their actual freedom ;" and further, that on the first of January, 1863, he would by proclamation designate the States and parts of States, if any, in which the people thereof, respectively, shall then be in rebellion against the United States. And designating the States and parts of States in which the rebellion existed, the proclamation says that, "as a fit and necessary war measure for suppressing the rebellion," "and by virtue of the power and for the purpose aforesaid, I do order and declare that all persons held as slaves within said designated States and parts of States, are and henceforward shall be free, and that the executive government of the United States, including the military and naval authorities thereof, will recognize and maintain the freedom of said persons." "And upon this act, sincerely believed to be an act of justice, warranted by the Constitution upon military necessity, I invoke the considerate judgment of mankind," &c.

The State of Florida is one of the States designated, in which the said rebellion existed. The courts of the several States and of the United States have judicially recognized the late insur-

rection and rebellion by the people of a portion of the States of the Union, as a civil war, and have so recognized many of the measures taken by the military authorities of the United States in conducting the war.

The question arises, however, whether the proclamation of a military commander, under the laws of war, has a present legal effect upon persons beyond the lines of military occupation by the power from which the proclamation emanates.

The Supreme Court of Alabama has held that it "had no force or validity until the Federal Government was enabled by conquest or the power of arms to enforce it," and "that the institution of slavery was destroyed by the act of war." 40 Ala., 524.

Personal property within an enemy's country may be taken by military order, and the owner's title thereby divested, but the right of owners is not divested until actual seizure and appropriation.

In time of peace the President, with or without the sanction or authority of Congress, had no power to issue a proclamation freeing the slaves ; but as Commander-in-Chief of the Army he had the power, during the war, to issue any military order authorized by the usages of modern warfare, which the circumstances required ; but no military order or proclamation issued by him could have effect over persons or property not within the lines of military occupation, but within the lines of the enemy and over which they had exclusive control. Lawrence's Ed. Wheat. Int. Law, 604—Notes.

The proclamation was purely, as it purports to be, a war measure, issued by the President as Commander-in-Chief in time of war, and to affect the war. Under it, slaves coming within the lines of Federal military occupation could not be reclaimed by their former owners. They were thus practically free by means of actual force ; by the power of arms. "The rights of owners of slaves, not within the lines of military occupation of the United States during the late war, were in no wise affected

476    SUPREME COURT.

Henry Slaback vs. Leoma L. Cushman—Opinion of Court.

or impaired by the emancipation proclamation of the President." Dorris vs. Grace, 24 Ark., 326.

We have not found many decisions of the courts touching the question, but are inclined to adopt the general doctrine above quoted in disposing of this case.

Mr. Dana, in his edition of Wheaton's International Law, (440, 441,) makes the following note. Without adopting all his suggestions, we give them as the views of a prominent member of the legal profession and writer upon elementary law :

" A slave stands in two relations to his master and his master's sovereign : that of an article of property and that of a human being. Regarded as a mere article of property on land, a movable corporeal chattel, he would not be transferred from the private citizen to the occupying power, except as being contraband of war ; a test that could be applied only to the males capable of military service or of labor in aid of war. But as persons capable of being used by the will of the master or his State, irrespective of their own will, in war, as soldiers or as laborers, the occupying sovereign has the right to transfer their faculty of service from the enemy to himself.

" They are so directly liable to State control in war, that their condition follows the fortunes of the war. * * *

" If the occupying State hold slaves, the slaves merely change masters ; if it does not, the slaves are emancipated. Their emancipation is as complete as their mere transfer would have been. It is a plenary act of ownership exercised upon them by the capturing power in actual possession. The emancipating of slaves by the occupying power may also be treated as an exercise of temporary power of conquest over the political system of the ejected enemy, which, as far as it operates on slaves to give them freedom, is complete, and must be so regarded by all neutrals, and by the conquered State itself after peace, on the principle of *uti possidentis*."

During the civil war of 1861--5, the commanders of the national forces refused to restore slaves that fled to their lines, or

that came under their control, to masters who were domiciled in places under control of the rebel enemies. This was a war measure, and put on the ground that the slaves were in the nature of contraband of war. By the act of Congress of July 17, 1862, (U. S. Laws, XII., 590), slaves of any persons engaged in the rebellion, coming within the lines of the armies of the United States, and all slaves captured from such persons, or deserted by them, and coming under the control of the armies of the Union, and slaves of such persons found in any place occupied by the rebel forces and afterwards by the armies of the Union, were declared to be captives of war, and to be forever free.

By the same act, the President was authorized to employ persons of African descent in the public military service. President Lincoln, by a proclamation of 1st January, 1863, designated certain States and parts of States as still engaged in rebellion, and then declared the persons held as slaves therein to be henceforth free.

It will be observed that this order of emancipation was not a legislative act of the law-making power of the Union, but an act of the President in his character as Commander-in-Chief, and a military measure. Although the language of the proclamation is general, and in the present tense, as if giving a legal status of freedom from its date to all slaves in the designated States, still, from the nature of the case, it would seem, that being a military measure, by a Commander-in-Chief who had no general legislative authority over regions of country not in his possession, it could not operate further than as a military order. From that time, all slaves coming under the control of the forces of the United States, in the manner recognized by the law of belligerent occupation, were to be free. If this is the correct view of the virtue of the proclamation, it became thereafter a question of fact, as to each slave and each region of country, whether the forces of the Union had such possession as to give effect to the proclamation. In time of peace, the relation of master and slave was matter of local and not of national legis-

lation ; and it could not be maintained that the civil war gave Congress a general legislative power on that subject over regions of country covered by those States and not in possession of the Union forces ; or that the President, as Commander-in-Chief, had any legislative functions which could operate by a mere declaration of his will in places out of his belligerent control.

Upon the state of the evidence in this case, the charge of the court was not erroneous, and the judgment must be affirmed.

WESTCOTT, J.

Whether the proclamation was effective for any purpose within the lines of the federal army, is not involved in this case, and while I agree with the judgment of the court, I express no opinion as to whether, with the acts of Congress and under all the circumstances existing at the date of that proclamation, the President had such power under the Constitution of the United States in reference to the property of residents within army lines. It certainly was not effective *outside of the line of military occupation*, and that is the question involved in this case.